UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

AMY GOODMAN, NICOLE SALAZAR,
and SHARIF ABDEL KOUDDOUS,

            Plaintiffs

    v.

CITY OF ST. PAUL, a municipal entity and
political subdivision of the state of Minnesota;
CITY OF MINNEAPOLIS, a municipal entity
and political subdivision of the state of Minnesota;
RAMSEY COUNTY, a political subdivision of
the state of Minnesota; JOHN HARRINGTON,
Chief of St. Paul Police Department, in his official
and individual capacity; TIMOTHY DOLAN,
Chief of Minneapolis Police Department, in his
official and individual capacity; BOB FLETCHER,
Sheriff of Ramsey County, Minnesota, in his
official and individual capacity; BOBBY HALL,
in his individual capacity as a Police Officer;
JOHN DOE, an unidentified Secret Service Agent;
and JOHN ROE 1-20, unidentified law enforcement
officers, in their official and individual capacities,

            Defendants.

COMPLAINT AND
DEMAND FOR
JURY TRIAL

CIVIL ACTION NO. ____

## PRELIMINARY STATEMENT

1.      Before and during the 2008 Republican National Convention ("RNC") in Minneapolis-St. Paul, Minnesota, federal and local law enforcement authorities, acting in concert, arrested scores of journalists who were simply carrying out their work duties and exercising their First Amendment rights.

2.      In the days leading up to the RNC, federal and local law enforcement officials conducted "pre-emptive" raids in Minneapolis-St. Paul that involved the arrest and interrogation of journalists.

3.      During the RNC, law enforcement arrested journalists without probable cause, physically assaulted them, detained them for lengthy periods, and searched and seized their belongings, including their cameras, video, and other media equipment, even though many of these individuals displayed their press credentials prominently and repeatedly identified themselves as members of the media.

4.      The three journalists who have brought the instant action – Amy Goodman, Sharif Abdel Kouddous, and Nicole Salazar – were covering the RNC for Democracy Now!, an award-winning and nationally syndicated independent television and radio news program.  They are among the journalists who were arrested and assaulted during the RNC even though they posed no threat to anyone and even though they clearly and repeatedly identified themselves as members of the press.

5.      By arresting, assaulting, and detaining Plaintiffs and other members of the press, law enforcement significantly hindered Plaintiffs' ability to serve as the eyes and ears of the American public and report on vital matters of public concern, namely, the RNC, public protest and civic engagement outside the RNC, and the conduct of law enforcement personnel at and around these events.

6.      Defendants' clearly unlawful actions violated Plaintiffs' rights under the Minnesota and United States Constitutions, as well as under state and federal law.  Plaintiffs bring this action to challenge Defendants' policies, practices, and/or actions that culminated in the unreasonable use of force and Plaintiffs' unlawful arrests, and which violated Plaintiffs' rights as journalists to gather information and cover matters of public interest, including law enforcement activity in public places.

7.      Plaintiffs intend to return to Minnesota to cover future newsworthy events, including both small- and large-scale protests.  Plaintiffs also intend to cover similar protests and gatherings throughout the United States as part of their journalistic activities.  Plaintiffs fear that they will be subjected to similar unlawful actions by federal and/or local authorities, including Defendants, as they conduct their job duties in the future.

## JURSIDICTION AND VENUE

8.      Plaintiffs' claims against the federal Defendant John Doe, an unidentified Secret Service Agent, are brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the First and Fourth Amendments to the United States Constitution.

9.      Plaintiffs' claims against the state and local defendants are brought pursuant to 42 U.S.C. § 1983, the Minnesota Constitution, and common law.

10.      This court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

11.      Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391, as a substantial part of the acts that gave rise to this lawsuit occurred principally in the City of St. Paul, in Ramsey County, Minnesota.

## THE PARTIES

**Plaintiffs**

12.      Plaintiff AMY GOODMAN is the host and executive producer of Democracy Now!, a national, daily news program aired on over 800 radio and television stations.

13.      In her 25 years as a journalist, Ms. Goodman has covered dozens of conventions and demonstrations around the world.  Her work has garnered wide recognition.  In 2008, Ms.

Goodman was awarded the Right Livelihood Award, also known as the "Alternative Nobel

Prize."  She has also received the George Polk Award; the Robert F. Kennedy Prize for

International Reporting; the Alfred I. duPont-Columbia Award; the Radio/Television News

Directors Association award; the American Women in Radio and Television Gracie Award; the

Paley Center for Media's She's Made It Award; the Puffin/Nation Prize for Creative Citizenship,

and the Park Center for Independent Media's "Izzy" Award.

14.     Ms. Goodman is a resident of New York.  In August 2008, she traveled to St.

Paul, Minnesota to cover the RNC, which was held at the Xcel Energy Center.  Ms. Goodman

was granted a media pass issued by the RNC, which allowed her to enter the convention center

and interview delegates on the convention floor.

15.     As part of her duties as an investigative journalist, Ms. Goodman also covered the

stories of the thousands of demonstrators protesting the RNC on the streets in and around the

Xcel Energy Center.

16.     Plaintiff SHARIF ABDEL KOUDDOUS is a senior producer for Democracy

Now!

17.     Mr. Kouddous has worked at Democracy Now! for seven years. He

has covered news stories around the world, including reporting from Baghdad during the Iraq

war, New Orleans in the aftermath of Hurricane Katrina, and Haiti in the days after the January

2010 earthquake.  He has reported on news stories from numerous locations in the United States,

including the 2004 Democratic and Republican National Conventions.

18.     Mr. Kouddous is a resident of New York.  In August 2008, he traveled to St. Paul,

Minnesota, to cover the RNC.  Mr. Kouddous was granted a media pass issued by the RNC,

which allowed him to enter the convention center and interview delegates on the convention floor.

19.     As part of his job duties, Mr. Kouddous covered stories on the convention floor as well as news concerning the thousands of demonstrators protesting the RNC on the streets in and around the Xcel Energy Center.

20.     Plaintiff NICOLE SALAZAR is a multimedia producer for Democracy Now!.

21.     Ms. Salazar has worked at Democracy Now! for the past three years.  Her position has required her to film demonstrations, lectures, and interviews throughout the United States.

22.     Ms. Salazar is a resident of New York.  In August 2008, she traveled to St. Paul to cover the RNC.  Ms. Salazar was granted a media pass issued by the RNC, which allowed her to enter the convention center and interview delegates on the convention floor.

23.     As part of her job duties, Ms. Salazar covered the stories of the thousands of demonstrators protesting the RNC on the streets in and around the Xcel Energy Center.

**Defendants**

24.     Defendant CITY OF ST. PAUL is a municipality organized under the laws of the state of Minnesota.  It is the legal and political entity responsible for the actions of the St. Paul Police Department ("SPPD") and SPPD's officers, employees, and agents.

25.     Defendant JOHN HARRINGTON ("Harrington") is and, at all times relevant to the events underlying this action, was the Chief of Police of SPPD.  He is responsible for the policies, practices, and actions of the SPPD.

26.     Harrington has final policy-making authority for the SPPD, whether by virtue of specific statutory authority granted to him or delegation by a final policy-maker, including its policies concerning arrests and detention, use of force, and officer training.

27.     At all times relevant to this action, Harrington was an employee of the City of St. Paul and was acting under color of law.

28.     Harrington authorized, approved, and/or condoned the policies and actions challenged in this lawsuit.

29.     Defendant CITY OF MINNEAPOLIS is a municipality organized under the laws of the state of Minnesota.  It is the legal and political entity responsible for the policies, practices, and actions of the Minneapolis Police Department ("MPD") and MPD's officers, employees, and agents.

30.     Defendant TIMOTHY DOLAN ("Dolan") is and, at all times relevant to the events underlying this action, was the Chief of Police of MPD.  He is responsible for the policies, practices, and actions of the MPD.

31.     Dolan has final policy-making authority for the MPD, whether by virtue of specific statutory authority granted to him or delegation by a final policy-maker, including its policies concerning arrests and detention, use of force, and officer training.

32.     At all times relevant to this action, Dolan was an employee of the City of Minneapolis and was acting under color of law.

33.     Dolan authorized, approved, and/or condoned the policies and actions challenged in this lawsuit.

34.     Defendant RAMSEY COUNTY ("County") is a political subdivision of the state of Minnesota.  The County is the legal and political entity responsible for the policies, practices, and actions of the Ramsey County Sheriff's Department (or "Sheriff's Department") and those of the Sheriff Department's officers, employees, and agents.

35.     Defendant BOB FLETCHER is and, at all times relevant to the events underlying this action, was the Sheriff of Ramsey County, Minnesota.  He is responsible for the policies, practices, and actions of the Ramsey County Sheriff's Department.

36.     Whether by virtue of specific statutory authority granted to him or delegation by a final policy-maker, Fletcher has final policy-making authority for the Ramsey County Sheriff's Department, including its policies concerning arrests and detention, use of force, and officer training.

37.     At all times relevant to this action, Fletcher was an employee of Ramsey County and was acting under color of law.

38.     Fletcher authorized, approved, and/or condoned the policies and actions challenged in this lawsuit.

39.     Defendant BOBBY HALL is an adult individual who, at all times relevant to the events underlying this action, was employed as a police officer and acted under color of law.

40.     Upon information and belief, Defendant JOHN DOE, an unidentified Secret Service Agent, is an adult individual who, at all times relevant to the events underlying this action, was employed by the United States Secret Service Agency and whose conduct violated Plaintiffs' First and Fourth Amendment rights under the federal Constitution.

41.     John Doe was, at all relevant times, acting under the color of law and pursuant to the policies, practices, and customs of the named and as yet unidentified defendant agencies.

42.     Upon information and belief, Defendants JOHN ROE 1 through 20, unidentified law enforcement officers, are individuals who engaged in joint planning and/or joint action with the named defendants to deprive Plaintiffs of their clearly established rights under the First,

Fourth, and Fourteenth Amendments of the United States Constitution and their clearly established rights under the Minnesota Constitution.

43.     John Roe 1 through 20 engaged in the arrests and detention of Plaintiffs in the absence of probable cause or lawful justification.

44.     John Roe 1 through 20's conduct also violated Plaintiffs' rights as journalists to gather information and cover matters of public interest, including law enforcement activity in public places.

45.     John Roe 1 through 20 were, at all relevant times, acting under the color of law and pursuant to the policies, practices, and customs of the named and as yet unidentified Defendant agencies.

46.     Upon information and belief, at all times relevant herein, all individual Defendants acted pursuant to the official policies and customs of the Defendant county and municipal entities.  These policies and customs were approved of, condoned, and/or enforced by the persons and/or entities with the authority to set policy for each of the non-federal government defendants.

47.     Defendants City of St. Paul, City of Minneapolis, Ramsey County, Dolan, Harrington, and Fletcher failed to train their officers, employees and/or agents on the proper and permissible use of force and the constitutional limitations on defendants' ability to restrain activity protected by the First and Fourteenth Amendments under the United States Constitution and pursuant to the Minnesota Constitution.

# FACTS

**Background**

48.     In or around September 2006, the Republican National Committee selected St. Paul as the host city for the 2008 Republican National Convention ("RNC").

49.     Thereafter, the Republican National Committee entered into a Site Agreement setting forth certain terms pursuant to which the RNC would be held in Minneapolis-St. Paul.

50.     The parties to the Site Agreement include the Republican National Committee; the Committee on Arrangements for the 2008 RNC, a political action committee connected with the Republican National Committee; and the Minneapolis-St. Paul 2008 Host Committee, Inc., ("Host Committee"), a non-profit corporation organized to promote the cities' RNC-hosting abilities.

51.     Additionally, the City of Minneapolis entered into a "City Service Agreement" with the Host Committee, to effectuate the obligations, terms and conditions set forth in the Site Agreement.

52.     As set forth in the City Service Agreement, the Host Committee agreed to obtain insurance coverage to cover liability in apparent contemplation of misconduct by law enforcement pertaining to RNC-related events.

53.     The insurance policy obtained by the Host Committee names as covered parties the Republican National Committee, the Committee on Arrangements for the 2008 RNC, the City of St. Paul, the City of Minneapolis, and any municipality or entity that enters into a joint powers agreement with the City of St. Paul.

54.     The Host Committee paid $1.2 million for the insurance policy which caps liability at a maximum of $10,000,000.

55.     In or around March 2007, the United States Department of Homeland Security designated the RNC a "National Special Security Event."

56.     Pursuant to policies and procedures triggered by such a designation, the United States Secret Service became the lead federal agency in charge of planning and executing security at and around the convention site.

57.     The Secret Service also engaged with other federal as well as state and local law enforcement and public safety agencies and/or officials to plan and enforce security at and around the convention site.

58.     The SPPD is a local agency that was involved in the planning, coordination, and execution of law enforcement operations outside the Xcel Energy Center during RNC.

59.     The SPPD shared responsibility with federal, state, and other local law enforcement and public safety agencies and/or officials for training related to such operations.

60.     In addition, Frank Spicka, RNC Director of Security, announced on October 10, 2007 he would be working "in close partnership with local, state, and federal law enforcement in planning, coordinating, and implementing a comprehensive security plan for the convention."

61.     Defendants, acting according to official policies and practices, were responsible for the violations of Plaintiffs' rights set forth herein by, inter alia, engaging in warrantless arrests, unlawful detentions, and unlawful seizures of their persons, all without adequate justification or cause; engaging in unlawful seizures of property; using unreasonable, unnecessary, and excessive force; and interfering with their rights as members of the press under the United States and Minnesota Constitutions.

62.     The acts complained of herein were part of a deliberate policy of intimidation by all Defendants aimed at suppressing Plaintiffs' First, Fourth, and Fourteenth Amendment rights

under the United States Constitution and Plaintiffs' rights and liberties under Article 1 of the Minnesota state constitution.

63.     Each of the acts complained of herein was taken, and each violation of Plaintiffs' rights occurred, pursuant to the policies and/or practices of the named Defendants and the Unidentified Defendants – who joined, collaborated, and acted in concert with the named Defendants – to unlawfully detain, search, arrest, and use unreasonable force, all without adequate justification or cause.

64.     Each of the acts complained of herein were willful, wanton and malicious, and displayed a callous disregard for and deliberate indifference to Plaintiffs' rights under state law, the Minnesota state constitution, and the United States Constitution.

**September 1, 2008 Arrest of Ms. Salazar**

65.     On September 1, 2008, the first day of the RNC, Ms. Salazar and Mr. Kouddous were working in a rented office in the same building as the Saint Paul Neighborhood Network in downtown St. Paul when, during the early afternoon, they observed dozens of law enforcement personnel donning riot gear and gas masks outside the office, on the streets in the vicinity of 7th Street and Jackson Street.

66.     Ms. Salazar and Mr. Kouddous grabbed their audio and video recording equipment and identification indicating that they were journalists, and came outside to the street to document the activities of the officers.

67.     Ms. Salazar and Mr. Kouddous taped the movement of the officers around downtown and some of their encounters with peaceful demonstrators and passers-by.

68.     Ms. Salazar and Mr. Kouddous noticed that the numbers of law enforcement in riot gear seemed to be increasing and their demeanor was growing increasingly tense.

69.     At one point, Ms. Salazar was videotaping law enforcement officers as they directed journalists, including one who identified himself as with the Associated Press, to move in the direction of a parking lot.  One journalist stated, "I'm a journalist," to which an officer replied, "I don't care.  Back up and move that way."  The officers proceeded to corral the journalists into a parking lot.

70.     In addition to Ms. Salazar and other journalists who were recording the police activities, members of the public were also corralled into the parking lot.

71.     Suddenly, a number of officers in riot gear with batons entered the parking lot and started rushing in the direction where Ms. Salazar and others were standing.

72.     As Ms. Salazar videotaped the officers approaching, a few ran toward an individual near Ms. Salazar who was holding her empty hands by her head, in a display of compliance.

73.     Ms. Salazar continued taping as at least one officer appeared to swing at the innocent bystander with his baton.

74.     At approximately the same time, officers began rushing toward Ms. Salazar.

75.     Ms. Salazar continued to videotape the incident, walking quickly backwards in an effort to get out of the way of the oncoming officers.

76.     While Ms. Salazar was attempting to back away, one or more of the officers continued to rush toward her.  Ms. Salazar found herself in between parked vehicles and the oncoming officers, with no way out.

77.     When one of the officers running toward Ms. Salazar wielding his baton yelled at Ms. Salazar to "get out of here," she asked him where she should go, saying that she could not see and that there was "no place to go."

78.     Throughout this encounter, Ms. Salazar was visibly wearing and holding up her Democracy Now! press pass and holding media equipment.

79.     In addition, Ms. Salazar yelled out "press, press!" to identify herself as a journalist.

80.     Without provocation, several of the Roe defendants violently pushed Ms. Salazar into a parked vehicle and then shoved her off her feet and onto the ground as they shouted, "on your face."

81.     After Ms. Salazar was forced to the ground, her camera was knocked from her hands and fell some feet away.

82.     Ms. Salazar was then forcibly held face-down on the pavement.

83.     Ms. Salazar could feel one of the Roe defendants pushing her into the ground with his boot or knee pressed onto her back, while another Roe defendant was grabbing her leg, trying to drag her.

84.     Even though Ms. Salazar was not resisting arrest, did not pose a threat to herself or anyone else, and continued to identify herself as "press," the officers continued to use force against her.

85.     Several of the Roe defendants handcuffed her hands behind her back.  At the time she was handcuffed, Ms. Salazar was holding her press credentials in her hands, behind her back, in plain sight of the officers.

86.     Ms. Salazar saw that a pool of her blood had collected on the pavement where her face had been.

87.     As a result of these Roe defendants' actions, Ms. Salazar suffered lacerations and injuries to her face, leaving her bloodied, bruised, scratched, and in pain.

88.     While Ms. Salazar remained handcuffed face-down on the ground, one of the Roe defendants picked up her camera and removed the battery.

89.     When the officers allowed Ms. Salazar to stand, she asked that her press credentials be replaced around her neck.  One of the Roe defendants told her it was better if she held them out of sight, and that otherwise they might be taken away, or words to that effect.

90.     Several of the Roe defendants then brought Ms. Salazar over to a nearby area, where she joined a group of other people who also had been handcuffed.

91.     A police medic approached Ms. Salazar, wiped her face clean of blood while she was still handcuffed, and asked if her teeth hurt.

92.     Some time later, Ms. Salazar had her picture taken with two of the Roe defendants who allegedly had arrested her.  One of these individuals was identified to Ms. Salazar as Bobby Hall.  However, it is unclear whether these individuals were actually involved in her arrest.

93.     After her picture was taken, Ms. Salazar was placed in a van with several other arrestees.

94.     Ms. Salazar was held for approximately two hours in the parking lot, before being transported to the Ramsey County Law Enforcement Center ("Ramsey County jail").

95.     At Ramsey County jail, Ms. Salazar was held in a cell for approximately three hours before being released.

96.     During this period, Ms. Salazar shared the cell with approximately seventeen other female arrestees, some of whom had been pepper sprayed by law enforcement and were still noticeably suffering the consequences.

97.     At no time was Ms. Salazar told the basis for her arrest.

98.     Defendants issued Ms. Salazar a citation for felony riot, St. Paul case number 08230423.

99.     After Ms. Salazar was released from jail, she went to a hospital emergency room where she was treated for her injuries.

**September 1, 2008 Arrest of Mr. Kouddous**

100.     Mr. Kouddous arrived at the parking lot where Ms. Salazar was videotaping law enforcement activity, shortly before she was arrested.

101.     Mr. Kouddous was holding a microphone in one hand.  Additionally, his Democracy Now! and RNC press passes were visible, hanging around his neck.

102.     Mr. Kouddous observed other journalists standing near him who were observing and taping the activities of the law enforcement in the parking lot.

103.     Mr. Kouddous saw Ms. Salazar being arrested and called out to the surrounding officers that she was a member of the press.

104.     Seconds after Mr. Kouddous identified Ms. Salazar as a journalist, approximately three Roe defendants, unidentified officers in riot gear, approached him.

105.     Without provocation, these Roe defendants cornered him against a building and forcibly slammed him against the wall.

106.     Mr. Kouddous stated that he was not resisting and identified himself as a member of the press.

107.     These Roe defendants continued to use excessive and unnecessary force against Mr. Kouddous, pushing him against the wall and kicking and/or punching him in the chest and back.

108.    When these Roe defendants asked Mr. Kouddous to extend his hands, Mr. Kouddous complied and the officers handcuffed him with his hands behind his back.

109.    These Roe defendants ordered Mr. Kouddous to lie on the ground, face-down.

110.    During the course of his arrest, as a result of these Roe defendants' actions, Mr. Kouddous felt an acute pain in his chest.  As a result of these Roe defendants' actions, he suffered injuries to his back, arms and hands.

111.    At some point during this incident, some of the Roe defendants took the microphone away from Mr. Kouddous.

112.    Throughout this incident, Mr. Kouddous did not pose a threat to himself or to anyone else.

113.    During his arrest and repeatedly during his detention, Mr. Kouddous identified himself to officers, including these Roe defendants, as a member of the press.

114.    In response, one of the Roe defendants told Mr. Kouddous that Mr. Kouddous should embed himself with the police if he wished to report on any street demonstrations surrounding the RNC, or that he should observe events from afar using a telescopic lens.

115.    Mr. Kouddous observed at least one other journalist who had also been forced to the ground and arrested.

116.    After being held on the ground for some time, Mr. Kouddous was pulled to his feet and his microphone was returned to him.

117.    Mr. Kouddous complained to several Roe defendants that his handcuffs were too tight and were causing him pain and, later, numbness.  No Roe defendant or any other officer responded to his pleas for assistance.

118.   Some time later, Mr. Kouddous had his picture taken with a Roe defendant who allegedly had arrested him.  However, it is unclear whether this individual was actually involved in his arrest.

119.   After being held in handcuffs for two to three hours in the parking area, Mr. Kouddous was placed on a bus with other arrestees and taken to Ramsey County jail.

120.   On the bus ride, Mr. Kouddous was in constant pain, especially in his hands, which were still handcuffed tightly.

121.   Mr. Kouddous suffered long-term numbness in his hands and residual chest pain that lasted for several weeks after the September 1, 2008 incident.

122.   Mr. Kouddous was held for approximately five to six hours between the time of his arrest and the time of his release from Ramsey County jail.

123.   Mr. Kouddous was told he would be facing a felony riot charge.

124.   For weeks after the arrest, Mr. Kouddous suffered pain from the Roe defendants' use of excessive force.  He experienced numbness in his left thumb for weeks and pain near his breast bone.  Mr. Kouddous also has sustained scars on his arms from the incident.

**September 1, 2008 Arrest of Ms. Goodman**

125.   Ms. Goodman was interviewing Republican delegates at the Xcel Convention Center at the time of the arrests of Ms. Salazar and Mr. Kouddous.

126.   Upon receiving a phone call from a Democracy Now! producer indicating that Ms. Salazar and Mr. Kouddous had been arrested, Ms. Goodman cut short her interviews at the convention site and ran to the area of the arrests.

127.   When Ms. Goodman arrived at the parking lot area where arrestees had been gathered, she observed a ring of officers in riot gear.

128.    She approached the officers, announced her press credentials, and asked that Ms. Salazar and Mr. Kouddous be released.  At the time, Ms. Goodman was visibly wearing her press pass and her RNC pass around her neck.

129.    In response, a Roe defendant in riot gear grabbed Ms. Goodman by the arm and pushed her away from the scene.

130.    While the Roe defendant was still holding her, Ms. Goodman continued to inquire about her arrested co-workers.  The Roe defendant then pulled Ms. Goodman through the police line, asked another Roe defendant whether he should arrest Ms. Goodman, and then announced that he was arresting her.

131.    Two Roe defendants then placed handcuffs on Ms. Goodman and took her jacket.

132.    Throughout this incident, Ms. Goodman did not pose a threat to herself or to anyone else.

133.    After handcuffing Ms. Goodman, several Roe defendants brought her over to a wall where they directed her to get on the ground.

134.    When Ms. Goodman refused, they pushed her to the ground.

135.    The Roe defendants then brought Ms. Goodman over to where Mr. Kouddous was being held.

136.    At the time, Ms. Goodman was loudly declaring, "We are press, we demand to be released," or words to that effect.

137.    Some time later, John Doe, an unidentified Secret Service Agent, approached Ms. Goodman and Mr. Kouddous, and took their RNC press passes, stating, "You're not going to need this today," or words to that effect.

138.     As John Doe walked away with the press credentials, Mr. Kouddous asked one of the officers standing near him for a receipt or documentation of their property.  The officer did not respond.

139.     Referring to John Doe's act of taking away their press credentials, Ms. Goodman stated to the officers standing near Mr. Kouddous and her that the police should not be engaging in such activity.  One officer responded that John Doe was not a police officer but a member of the United States Secret Service.

140.     While waiting, Ms. Goodman informed a nearby Roe defendant that her handcuffs were too tight and causing her pain.  That Roe defendant came over and deliberately tightened the handcuffs even further.

141.     Some time later, Ms. Goodman had her picture taken with a Roe defendant who allegedly had arrested her.  However, it is unclear whether this individual was actually involved in her arrest.

142.     Ms. Goodman was then taken to the van in which Ms. Salazar and other arrestees were being held.

143.     Thereafter, Ms. Goodman was driven to a garage where cages had been erected for protesters.  She was held there for several hours and processed before being released.

144.     Between the time of her arrest and the time of her release, Ms. Goodman was held for over three hours.

145.     For weeks after the arrest, Ms. Goodman experienced pain in her left hand and wrist. She also felt a persistent sharp pain and tingling sensation from her thumb to her elbow in her left arm as a result of the handcuffs.

146.    Defendants issued Ms. Goodman a citation for interference with a peace officer and obstruction of a legal process.

147.    Defendants did not have a warrant or probable cause to arrest Ms. Salazar, Mr. Kouddous, or Ms. Goodman.

148.    Defendants acted without Plaintiffs' consent and without lawful authority when they seized the Plaintiffs' belongings and assaulted, battered, falsely arrested and falsely imprisoned them.

149.    On the evening of September 1, 2008, then Mayor of St. Paul Chris Coleman and St. Paul Police Chief John Harrington held a press conference during which they discussed the actions of law enforcement earlier that day.

150.    At that press conference, several journalists asked Mayor Coleman and Chief Harrington whether they were aware that journalists had been arrested, including Ms. Goodman.

151.    On September 2, 2008, Chief Harrington held another press conference.  Ms. Goodman attended that press conference, described the events of the previous day, and asked what his department's policy was with respect to the arrest of journalists.  Chief Harrington responded by stating, inter alia, that police officers were unable to make "fine distinctions" between reporters and other members of the public, and that the fact that someone is a reporter did not "give them additional rights to commit any crimes."

152.    Chief Harrington also claimed that he was giving reporters "extraordinary" access to events by embedding them with mobile field forces.

**September 4, 2008 Arrest of Mr. Kouddous**

153.    On September 4, 2008, Mr. Kouddous, along with three other Democracy Now! journalists, were covering peaceful demonstrators who had gathered about one-half mile from the Xcel Center.

154.    Law enforcement in riot gear had also gathered around the demonstrators and had blocked off the demonstrators' ability to navigate the public streets.

155.    Mr. Kouddous and a Democracy Now! cameraperson, Rick Rowley, as well as journalists from other press outlets, were following the demonstrators and recording the actions of law enforcement.

156.    Around dusk, the demonstrators were walking parallel to the river, mostly along Marion Street.  Mr. Kouddous and Mr. Rowley followed the demonstrators as they did so. Suddenly, law enforcement released a series of smoke bombs and detonated concussion grenades.

157.    As people began to disperse, law enforcement corralled several hundred people onto the Marion Street bridge and blockaded both ends so that no one could leave.

158.    Mr. Kouddous and Mr. Rowley were both trapped on the bridge.  Both had their press credentials displayed around their necks, and Mr. Rowley was holding video recording equipment.

159.    When law enforcement ordered everyone on the bridge to sit on the ground, Mr. Kouddous complied and held out his press credentials, identifying himself as a journalist to several officers near him.

160.     Despite posing no threat and having identified himself as a journalist, several Roe defendants placed Mr. Kouddous and Mr. Rowley under arrest on the bridge.  Roe defendants then escorted them to a sidewalk next to the bridge.

161.     Mr. Kouddous witnessed approximately three other individuals who also had press credentials displayed and media equipment in hand similarly being placed under arrest.

162.     Shortly after they were escorted to the sidewalk, one law enforcement officer stated, "Why don't you leave when we tell you to?" or words to that effect.

163.     Mr. Kouddous, Mr. Rowley, and the three other journalists were held at the sidewalk location for an hour and a half, at which point they were placed in a van and driven to a nearby parking lot.  There, they were released.  Mr. Kouddous was issued a citation for unlawful assembly.

164.     Upon information and belief, by the end of the RNC, over 40 journalists, including Plaintiffs, had been arrested.

165.     On September 19, 2008, criminal charges against all Plaintiffs were dropped.

166.     The Plaintiffs were humiliated and endured pain and suffering as a result of Defendants' actions.

167.     Additionally, Defendants' actions impeded Plaintiffs' ability to carry out their job duties and their ability to disseminate critical news about the RNC and surrounding events.

## FIRST CAUSE OF ACTION
### Freedom of the Press; Right to Gather Information

168.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth herein.

169.     Defendants violated Plaintiffs' rights to the unabridged freedom of the press under the First Amendment of the United States Constitution and liberty of the press under Article 1 of the Minnesota state constitution by, among other things, detaining and arresting Plaintiffs, seizing their property, interfering with their ability to gather information and cover matters of public interest, including law enforcement activity in public places, and deploying officers to disrupt Plaintiffs' press-related activities.

170.     Defendants engaged in such actions willfully and knowingly.

171.     As a direct and proximate result of defendants' unlawful actions, Plaintiffs have suffered physical harm, emotional pain and suffering, and loss of property.

## SECOND CAUSE OF ACTION
### Freedom from Unlawful Search and Seizure

172.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth herein.

173.     Defendants violated Plaintiffs' rights to be free of unlawful search and seizure under the Fourth Amendment of the United States Constitution and Article 1 of the Minnesota state constitution by, among other things, seizing and detaining Plaintiffs to interfere with their ability to engage in journalistic activities and/or without adequate cause; arresting them without probable cause; using excessive force; and assaulting them.

174.     Defendants engaged in such actions willfully and knowingly.

175.     As a direct and proximate result of defendants' unlawful actions, Plaintiffs have suffered physical harm, emotional pain and suffering, and loss of property.

### THIRD CAUSE OF ACTION
**Common Law False Arrest**

176.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth herein.

177.    Defendants' actions in subjecting Plaintiffs to false imprisonment and arrest without probable cause or warrants constituted false imprisonment and false arrest under the laws of the state of Minnesota.

178.    As a direct and proximate result of these actions, Plaintiffs suffered injury and harm.

### FOURTH CAUSE OF ACTION
**Common Law Assault**

179.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth herein.

180.    Defendants' actions in arresting and using excessive, unnecessary, and unreasonable force to restrain Plaintiffs were intended to cause an apprehension of imminent harmful or offensive contact and thus constituted assault under the laws of the state of Minnesota.

181.    As a direct and proximate result of these actions, Plaintiffs suffered injury and harm.

### FIFTH CAUSE OF ACTION
**Common Law Negligence**

182.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth herein.

183.    The individual officers and supervisors who are among the named Defendants and the John Roe defendants who were involved in Plaintiffs' unlawful arrests had the duty to exercise reasonable care toward Plaintiffs.

184.    The individual supervisors, including Chief Dolan, Chief Harrington, and their respective downward chain-of-command had the duty to exercise appropriate command authority in their supervision of their subordinates.

185.    Individual officers and supervisors among the named Defendants and John Roe defendants were negligent in the exercise of theses duties of care owed to Plaintiffs.

186.    As a direct and proximate result of these defendants' negligence, Plaintiffs suffered injury and harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

a)    A permanent injunction ordering Defendants, their officers, agents, and employees, from interfering with Plaintiffs' rights to engage in journalistic activities;

b)    A declaration that Defendants' actions to limit Plaintiffs' lawful journalistic activities constituted violations of the United States Constitution and Minnesota state constitution;

c)    Compensatory and punitive damages, including costs related to lost or damaged property, medical expenses, and other damages as permitted by law and as proven at trial;

d)    Award costs and attorneys' fees; and

e)    Award all other relief as the Court may deem just and proper.

Dated:  May 5, 2010

Respectfully submitted,

/s/ Bruce Nestor_____
Bruce D. Nestor - MN #0318024
3547 Cedar Avenue South
Minneapolis, MN  55407
612-659-9019 - Phone
612-436-3664 - Fax
nestor@denestlaw.com

Anjana Samant
Alexis Agathocleous
William P. Quigley
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY  10012
212-614-6445 - Phone
212-614-6499 - Fax

Steven Alan Reiss
Weil, Gotshall & Manges, LLP
767 Fifth Avenue
New York, NY  10153
212-310-8000 - Phone
212-310-8007 - Fax

*Attorneys for Plaintiffs*